GIBRALTAR ROCK, INC. and
Sahara Sand, Inc.

v.

NEW HANOVER TOWNSHIP,
Appellant.

Commonwealth Court of Pennsylvania.

Argued May 4, 2015.
Decided June 5, 2015.

Robert L. Brant, Jr. and Wendy F. McKenna, Trappe, for appellant.

Stephen B. Harris, Warrington, for appellees.

BEFORE: BERNARD L. McGINLEY, Judge, BONNIE BRIGANCE LEADBETTER, Judge and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge PATRICIA A. McCULLOUGH.

New Hanover Township (Township) appeals from the October 3, 2014 decision of the Court of Common Pleas of Montgomery County (trial court) granting declaratory relief in favor of Gibraltar Rock, Inc., and Sahara Sand, Inc., (together, Gibraltar) and decreeing that the Township's Stormwater Management Ordinance (SMO) is preempted by the Pennsylvania Noncoal Surface Mining Conservation and Reclamation Act (Noncoal Act).[1, 2]

### Background

Gibraltar owns approximately 240 acres of land in New Hanover Township, Montgomery County, and intends to operate a quarry in a Heavy Industrial (H–I) zone. More specifically, Gibraltar seeks to develop its property for a quarry, an aggregate processing facility, aggregate stockpiles, an office/scale house, a storage and parking area for machinery, an employee parking area, a loading area, a hot mix asphalt plant, and a ready mix concrete plant. (R.R. at 337a–38a.)

On April 15, 2005, the Department of Environmental Protection (DEP) issued Gibraltar a Noncoal Surface Mining Permit (Mining Permit) authorizing it to operate a quarry on the property. On June 8, 2007, the New Hanover Zoning Hearing Board granted Gibraltar a special exception, with conditions, to operate a quarry on its property and in an H–I zone. (R.R. at 338a–39a.) On appeal to this Court, we affirmed the grant of the special exception and reversed one of the conditions. *See In re: Appeal of Gibraltar*, (Pa.Cmwlth., No. 2287 C.D. 2011, 2013 WL 5614244, filed October 11, 2013) (unreported).

In 2009, Gibraltar sought to activate the Mining Permit, and, on September 11, 2009, the Township filed a complaint in equity, contending that Gibraltar did not have the requisite approval. On May 17, 2010, the trial court entered an order granting the Township a preliminary injunction and enjoining Gibraltar from quarrying or mining the property pending the Township's approval of a land development application and plan. (R.R. at 339a–40a.)

---

1. Act of December 19, 1984, P.L. 1093, *as amended*, 52 P.S. §§ 3301–3326.

2. Although neither party discusses any provision of the SMO, Article IV covers stormwater management and generally states that landowners proposing activities in the Township that are covered under the SMO are "required to find practicable alternatives to the surface discharge of stormwater, the creation of impervious surfaces, and the degradation of waters of the Commonwealth and must maintain as much as possible the natural hydrologic regime." (Reproduced Record (R.R.) at 113a.)

As a general proposition, the SMO states that "[s]tormwater drainage systems shall be designed in order to permit unimpeded flow along natural watercourses" and "[e]xisting points of concentrated drainage that discharges onto adjacent property shall not be altered in any manner which could cause property damage." (R.R. at 113a.) Per the SMO, all regulated activities within the Township must be "designed, implemented, operated, and maintained to meet the purposes of [the SMO], through these two elements: 1. Erosion and sediment control during earth disturbance activities (*e.g.*, during construction), and 2. Water quality protection measures after completion of earth disturbance activities (*i.e.*, after construction), including operations and maintenance." (R.R. at 114a–15a.)

Gibraltar then filed an application for land development with the Township, and, during the review process, issues related to the SMO arose. On February 20, 2013, Gibraltar filed the present declaratory judgment action in the trial court, seeking a declaration that the Township's SMO was preempted by the Noncoal Act. (R.R. at 340a.)

The parties submitted an extensive stipulation of facts, and the trial court convened a one-day bench trial. Gibraltar presented the testimony of its engineer and the DEP's district mining manager for the region, both of whom explained the process for obtaining the Mining Permit and the DEP's regulatory oversight of the quarry's operations. The Township produced its engineer, who opined that Gibraltar could comply with the requirements of both the Noncoal Act and the SMO, particularly with respect to the office/scale area, entranceway, and parking area. (Trial court decision at 1–2.)

On October 3, 2014, the trial court issued a decision pursuant to Pa.R.C.P. No. 1038 (governing a trial without a jury), concluding that sections 16 and 3 of the Noncoal Act preempted the SMO.[3] In so holding, the trial court rejected the Township's argument that the Noncoal Act's preemption clause did not apply because the SMO was enacted pursuant to the Pennsylvania Municipalities Planning Code (MPC).[4] Instead, the trial court found that the SMO was specifically adopted pursuant to the Pennsylvania Storm Water Management Act (SWMA).[5] (Trial court decision at 4.)

The trial court then determined that the SMO, as applied to stormwater that would come directly from the quarry pit operations, was expressly preempted by the Noncoal Act because these operations involve surface activity connected with mining. The trial court further concluded that the SMO, as applied to the site's collateral infrastructure (i.e., office/scale area, entranceway, and parking area), was also expressly preempted because the definition of "surface mining operations" includes "construction and related activities." The trial court determined that the phrase "construction and related activities" was broad enough to "encompass the construction and use of office buildings, scales, entranceways, and parking facilities for employees which are an integral part of a commercial mining operation." (Trial court decision at 3–4.)

Additionally, the trial court concluded that the requirements outlined in the Min-

---

**3.** Section 16 of the Noncoal Act provides:

Except with respect to ordinances adopted pursuant to the act of July 31, 1968 (P.L. 805, No. 247), known as the Pennsylvania Municipalities Planning Code, all local ordinances and enactments purporting to regulate surface mining are here by superseded. The Commonwealth, by this enactment, hereby preempts the regulation of surface mining as herein defined.

52 P.S. § 3316. Section 3 of the Noncoal Act defines "surface mining" as follows:

The extraction of minerals from the earth, from waste or stockpiles or from pits or from banks by removing the strata or material that overlies or is above or between them or otherwise exposing and retrieving them from the surface, including, but not limited to, strip mining, auger mining, dredging, quarrying and leaching and all surface activity connected with surface or underground mining, including, but not limited to, exploration, site preparation, entry, tunnel, drift, slope, shaft and borehole drilling and construction and activities related thereto; but it does not include those mining operations carried out beneath the surface by means of shafts, tunnels or other underground mine openings.

52 P.S. § 3303.

**4.** Act of July 31, 1968, P.L. 805, as amended, 53 P.S. §§ 10101–11202.

**5.** Act of October 4, 1978, P.L. 864, as amended, 32 P.S. §§ 680.1–680.17.

ing Permit are different than the requirements of the SMO and, therefore, the Noncoal Act displaced the SMO as a matter of conflict preemption. Particularly, the trial court determined that Gibraltar's evidence demonstrated that the Mining Permit regulates stormwater through the use of settling basins and sediment traps with riprap outfalls, while the SMO regulates stormwater using standard detention basins with concrete discharge systems. (Trial court decision at 2, 5.)

After the trial court issued its decision, the Township filed a notice of appeal to this Court.[6] The trial court then ordered the Township to file a Pa.R.A.P. 1925(b) statement, and, when it did, the trial court filed a Pa.R.A.P. 1925(a) opinion, relying on the reasoning set forth in its October 3, 2014 decision. (See R.R. at 3a.)

**Discussion**

■ As an initial matter, we determine whether the Township waived the issues that it raises in its appellate brief. It is now well settled that this Court may dismiss an appeal *sua sponte* based on an appellant's failure to properly preserve issues for appellate review. *See, e.g., Commonwealth v. Edmondson,* 553 Pa. 160, 718 A.2d 751, 752 n. 7 (1998) ("This Court may raise the issue of waiver *sua sponte.*"); *Tucker v. R.M. Tours,* 939 A.2d 343, 346 (Pa.Super.2007), *aff'd,* 602 Pa. 147, 977 A.2d 1170 (2009).

The Pennsylvania Supreme Court has concluded that the filing of a post-trial motion is mandatory if a litigant wishes to preserve issues for further review. *L.B. Foster Co. v. Lane Enterprises, Inc.,* 551 Pa. 307, 710 A.2d 55 (1998) (concluding that Pa.R.C.P. No. 227.1 "requires parties to file post-trial motions in order to preserve issues for appeal. If an issue has not been raised in a post-trial motion, it is waived for appeal purposes."). *See Municipal Authority of Hazle Township v. Lagana,* 848 A.2d 1089, 1092–93 (Pa. Cmwlth.2004).

■ Significantly, a litigant is required to file a post-trial motion following the entry of a decision/decree in a declaratory judgement action regardless of whether the case is decided on stipulated facts, after a bench trial, or some combination of both. *Motorists Mutual Insurance Company v. Pinkerton,* 574 Pa. 333, 830 A.2d 958, 964–65 (2003) ("[W]e hold that post-trial declaratory judgment orders, just like other post-trial orders, are subject to the post-trial motion procedures in Rule 227.1."); *id.* at 964 ("[O]rders following trials on stipulated facts must be treated just like orders following other trials, *i.e.,* in both situations, parties who wish to appeal must first file post-trial motions."). *See Warfield v. Shermer,* 910 A.2d 734, 738–39 (Pa.Super.2006).

---

**6.** Ordinarily, an appeal may be taken only from a judgment, not a decision. Here, the record indicates that the trial court's October 3, 2014 decision has not been reduced to and entered as a judgment under Pa.R.C.P. No. 227.4 (Entry of Judgment upon Praecipe of a Party). *See Crystal Lake Camps v. Alford,* 923 A.2d 482, 486–87 (Pa.Super.2007). However, our Supreme Court has overlooked the parties' failure to praecipe for judgment, and, instead of quashing the appeal as premature, the court has considered the appeal to have been properly filed based upon the principle

that courts may "regard as done that which ought to have been done." *McCormick v. Northeastern Bank of Pennsylvania,* 522 Pa. 251, 561 A.2d 328, 330 n. 1 (1989). *See Fanning v. Davne,* 795 A.2d 388, 392 (Pa.Super.2002) ("Were we to quash an appeal from an order which, except for the entry of judgment, is otherwise final, we would expend judicial resources in the decision to quash, one of the parties would inevitably praecipe the prothonotary to enter judgment, and a subsequent appeal would be permitted to follow.") (citation omitted).

Here, the trial court accepted a stipulation of facts, convened a one-day bench trial, and thereafter rendered a decision on October 3, 2014. An examination of the certified record and docket entries establishes that the Township did not file a post-trial motion after the trial court issued its decision, but, instead, filed a Pa. R.A.P. 1925(b) statement. (*See* R.R. at 3a.) Although the Township raised issues in its Pa.R.A.P. 1925(b) statement that it now seeks to argue on appeal, we conclude that these issues are nonetheless waived because the Township failed to file a post-trial motion before the trial court. *Diamond Reo Truck Co. v. Mid–Pacific Industries,* 806 A.2d 423, 429 (Pa.Super.2002) ("The failure to file post-trial motions cannot be excused or replaced by the filing of a 1925(b) statement. Thus, issues that are waived for failure to file post-trial motions or for other reasons cannot be revived or saved simply by raising those issues in a 1925(b) statement."), *accord Whitpain Homeowners Association v. Schiller,* 811 A.2d 1111, 1114 n. 4 (Pa.Cmwlth.2002).

Because the Township did not file a post-trial motion below, it did not preserve any issue for our review. *See L.B. Foster Co.,* 710 A.2d at 55.

Notwithstanding the fact that the Township waived all of its arguments for appeal, if this Court were to address the Township's contentions, we would conclude that they do not merit relief.

The Township first argues that the trial court erred in determining that the Township adopted the SMO pursuant to the SWMA. The Township contends that for purposes of the Noncoal Act's preemption provision, it matters not whether the SMO was adopted pursuant to the MPC or the SWMA, because the SMO was enacted after the Noncoal Act was enacted.

■ The Township is correct in its assessment of the preemption provision.

The first sentence of Section 16 of the Noncoal Act applies to local enactments that were in effect at the time the Noncoal Act was passed and supersedes those enactments that were not adopted under the MPC; on the other hand, the second sentence deals with all local enactments that were passed after the effective date of the Noncoal Act and preempts these enactments regardless of their enabling statutory authority. *See* 52 P.S. § 3316 ("Except with respect to ordinances adopted pursuant to the [MPC], all local ordinances and enactments purporting to regulate surface mining are hereby **superseded.** The Commonwealth, by this enactment, hereby **preempts** the regulation of surface mining as herein defined.") (emphasis added); *Hogan, Lepore & Hogan v. Pequea Township Zoning Board,* 162 Pa.Cmwlth. 282, 638 A.2d 464, 470–71 (1994), *overruled in part and on other grounds by Wistuk v. Lower Mount Bethel Township Zoning Hearing Board,* 592 Pa. 419, 925 A.2d 768, 774 n. 4 (2007) ("An ordinance promulgated under the MPC is not superseded under the first sentence of Section 16. In contrast, any local ordinance, even a township zoning ordinance or an amendment to a zoning ordinance which became effective *after* the effective date of the [Noncoal Act], is preempted under the second sentence of Section 16.") (emphasis in original).

Accordingly, it is immaterial whether the SMO was enacted pursuant to the MPC or the SWMA because the SMO was enacted subsequent to the Noncoal Act. The salient inquiry, instead, is whether the SMO regulates "surface mining" as that term is defined in the Noncoal Act. Despite its argument being meritorious, the Township, at most, has identified a prefatory error on the part of the trial court that does not control, much less have any effect on, the outcome of this case.

Next, the Township contends that the SMO is not expressly preempted by the Noncoal Act because the SMO is a traditional land use regulation. The Township asserts that it is required by the SWMA to enact a SMO and that the provisions of the SMO apply equally to all land development within the Township and do not specifically regulate quarry operations.

The Township further argues that the requirements of the SMO are not incompatible with the requirements of the Mining Permit and/or the Noncoal Act. The Township notes that its engineer testified that the SMO should apply and regulate Gibraltar's office/scale area, entranceway, and parking area; Gibraltar could comply with both the SMO and the Noncoal Act by installing additional stormwater management facilities on the site; and the Mining Permit only covers temporary stormwater management controls and does not govern permanent, post-construction stormwater management facilities.

In relevant part, section 16 of the Noncoal Act states that the statute "preempts the regulation of surface mining as herein defined." 52 P.S. § 3316. Section 3 of the Noncoal Act defines "surface mining" to consist, among other things, of "all surface activity connected with surface or underground mining, including, but not limited to ... construction and activities related thereto." 52 P.S. § 3303.

In defining the relationship between the Noncoal Act's preemption provision and land use regulation, this Court has recognized a distinction between an ordinance or zoning provision governing *where* a facility may be located (which is not preempted) and, on the other hand, an ordinance or operational regulation dictating *how* the facility will be technically designed and operated (which is preempted). *Geryville Materials, Inc. v. Planning Commission of Lower Milford Township*, 74 A.3d 322, 327 (Pa.Cmwlth.2013). Regardless of whether an ordinance applies specifically to a quarry or is neutral on its face, the ordinance will be preempted as an operational regulation if it regulates "surface mining" as that term is statutorily defined. *Id.* at 329–30.

Along these lines, this Court held in *Pennsylvania Coal Company, Inc. v. Township of Conemaugh*, 149 Pa.Cmwlth. 22, 612 A.2d 1090 (1992), that an ordinance's stormwater management provision was expressly preempted by the Noncoal Act. We determined that by managing and directing the quarry's stormwater, the ordinance "regulates the operation of ... activities which are appropriate aspects of surface mining," and, therefore, the stormwater measures were preempted as having a connection with "surface mining activities." *Id.* at 1093. This Court also noted that, by its very nature, the ordinance's stormwater management provision was "more extensive than the traditional land use controls accomplished by zoning." *Id.*[7]

Similarly, in *Geryville Materials, Inc.*, the township's expert witnesses testified, among other things, that the quarry's filtration system would discharge water onto the ground and cause erosion problems that would eventually damage wetlands, affect the quality of streams, and alter

7. *See also Geryville Materials, Inc.*, 74 A.3d at 327, wherein this Court interpreted the Supreme Court's decision in *Range Resources—Appalachia, LLC v. Salem Township*, 600 Pa. 231, 964 A.2d 869 (2009), as concluding that the township's ordinance pertaining to "storm water management plans" and "erosion and sediment control plans" was preempted under the 1984 Oil and Gas Act, *formerly* Act of December 19, 1984, P.L. 1140, *as amended*, 58 P.S. §§ 601.101–601.605, because the ordinance was an "operational regulation."

watercourse channels. This Court concluded that a provision of a zoning ordinance mandating, among other things, local approval to alter a watercourse was expressly preempted by the Noncoal Act. We determined that although the ordinance was neutral on its face, its provisions were turned into "operational regulations" by virtue of being applied to and regulating "water issues that confront every quarry." 74 A.3d at 329–30.

Here, our decisions in *Pennsylvania Coal Company* and *Geryville Materials* compel the conclusion that the Township's SMO is expressly preempted by the Noncoal Act to the extent that it is applied to the construction and operations of the quarry itself. When applied in this manner, the provisions of the SMO do not regulate where the quarry may be situated, but, rather, dictate how to manage stormwater that is generated from the quarry. As in *Pennsylvania Coal Company*, the SMO therefore seeks to regulate "construction" and "surface activities" that are "connected with surface ... mining," 52 P.S. § 3303, and falls within the ambit of the Noncoal Act's preemption clause. Although the Township is obligated to enact an SMO, it cannot apply it in a manner that regulates surface mining as that term is defined in the Noncoal Act.

Moreover, as the trial court concluded, the Noncoal Act's express preemption provision encompasses Gibraltar's erection of secondary infrastructure by defining "surface mining" very broadly to include "site preparation" and "construction" of objects "related ... to" the mining. 52 P.S. § 3303. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (discussing the "expansive sweep" of the phrase "relate to" in statute's express preemption provision and quoting the definition of "relate to" in Black's Law Dictionary—"to

stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with"). Stated differently, Gibraltar's office/scale area, entranceway, and employee parking lot all relate to, or are being constructed to effectuate, Gibraltar's surface mining endeavors.

For these reasons, the Township's SMO is expressly preempted by the Noncoal Act. Because the SMO regulates surface mining and falls within the scope of the Noncoal Act's express preemption provision, it matters not whether the Noncoal Act and the SMO are compatible, that is, whether both can be complied with at the same time, because conflict preemption principles are simply inapplicable. *See Hoffman Mining Company, Inc. v. Zoning Hearing Board of Adams Township, Cambria County*, 612 Pa. 598, 32 A.3d 587, 593–94 (2011) (explaining the difference between express preemption and conflict preemption). As a result, we need not address the Township's arguments pertaining to conflict preemption.

■ Finally, the Township attempts to differentiate between stormwater management measures taken during construction and permanent, long-term measures taken post-construction, arguing that the SMO should apply in the latter situation. However, the Noncoal Act contains no temporal limitation on surface mining activities based upon a pre- and post-construction distinction. Indeed, the preemption provision of the Noncoal Act has been interpreted by this Court to trump ordinances that sought to regulate activities taken post-construction and during the reclamation phrase. *Warner Company v. Zoning Hearing Board of Tredyffrin Township*, 148 Pa.Cmwlth. 609, 612 A.2d 578, 582 (1992) (concluding that an ordinance establishing procedures for reclamation upon cessation of quarrying operations was

preempted because the Noncoal Act covers "all surface activity connected with the mining," which necessarily includes "the reclamation of the affected land.").[8]

In sum, we conclude that the Township failed to preserve any issue for our review and, alternatively, that the Township's arguments do not entitle it to relief.

Accordingly, the trial court's October 3, 2014 order is affirmed.

### ORDER

AND NOW, this 5th day of June, 2015, the October 3, 2014 order of the Court of Common Pleas of Montgomery County is affirmed.

8. Notably, the DEP is legally obligated to monitor and oversee the site's stormwater management before, during, and after construction. *See* R.R. at 407a (permit requirements discussing construction of sediment basins and other impounds and erosion and sediment pollution controls), 412a (permit authorization to mine stating that "[t]he approved erosion and sediment control facility related to the area to be mined in accordance with this authorization must be constructed in accordance with the approved plan."); section 7(c)(8) of the Noncoal Act, 52 P.S. § 3307(c)(8) (stating that as part of the permit process, the applicant must submit a "complete and detailed plan for reclamation of the land affected," including "[t]he manner in which the operator plans to control surface water drainage [and] a practicable method of preventing or avoiding surface and groundwater pollution."). *See also* 25 Pa.Code §§ 77.406(a) ("An application shall contain a description of the surface waters, including

... descriptions of surface drainage systems within the proposed permit and general area."); 77.458 (Erosion and sedimentation control plan); 77.459 (Stream diversions, water obstructions and encroachments); 77.524 (governing groundwater diversions); 77.527 (Sedimentation controls); 77.528 (Discharge structures).

Moreover, Gibraltar's expert testified to Gibraltar's proposed stormwater management measures, which were approved by the DEP when it issued the Mining Permit. (R.R. at 249a–54a; 258a.) The expert also explained that under the DEP's regulatory process, these measures will "get transformed into permanent post-development stormwater BMPs," *i.e.*, "the best management practices," when the construction phase is completed. (R.R. at 252a.) During his testimony, the DEP's district mining manager confirmed that the DEP monitors the site until it is reclaimed. (R.R. at 289a–90a.)